2022 IL App (1st) 211389-U

THIRD DIVISION
October 26, 2022

No. 1-21-1389

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CRAIG B. URBAN, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 2020-L-13343 |
| | ) | |
| J.P. MORGAN CHASE & CO., INC., | ) | Honorable |
| | ) | James E. Snyder, |
| Defendant-Appellee. | ) | Judge Presiding |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Gordon and Burke concurred in the judgment.

ORDER

¶ 1 *Held*: *Res judicata* bars former employee's suit about his alleged wrongful termination and defamation in the financial business sector where he had already sued and twice arbitrated the same claims. His other appellate arguments are insufficiently briefed and are forfeited.

¶ 2 Craig B. Urban, acting *pro se*, filed an employment discrimination suit in federal court in 2011 against his former employer, J.P. Morgan Chase & Co., Inc. (Chase), and also initiated arbitration actions in 2012 and 2015 and this state court action in 2020. He appeals the dismissal of his state court action on the basis of *res judicata* and various statutes of limitation pursuant to sections 2-619(a)(4) and 619 (a)(5) of the Illinois Code of Civil Procedure (Code). 735 ILCS 5/2-619(a)(4), (a)(5) (West 2020). He contends that his Illinois suit was timely filed and that his prior

arbitration actions could not trigger *res judicata*. He does not address the *res judicata* effect of his federal action. Urban also seeks review of the circuit court's decision to dismiss a declaratory judgment count as factually deficient pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2020)), and the denial of his motions to sanction Chase and strike its memos.

¶ 3 Urban worked for Chase as a licensed personal banker for nearly two years beginning in January 2008.[1]

¶ 4 After he was fired in 2009, Urban, who is White, filed a race discrimination charge with the Equal Employment Opportunity Commission (EEOC), contending that he had been terminated for violating a policy about online banking procedures which was violated with impunity by his Hispanic colleague(s). Chase responded to the EEOC that within Urban's first year of employment, he was given a "Written Warning" for not following proper account opening policies and procedures. He also received a "Needs Improvement" rating in his 2008 job performance evaluation because he did not follow Chase's training to promote retail banking products and services. After he was transferred from Chase's Bucktown branch office to its North Pulaski location, he received a second "Written Warning" in early 2009. A few months later, when a different branch manager was transferred to head the North Pulaski location, that manager tried to

---

[1] In a footnote in its motion to dismiss, Chase stated that Urban sued the wrong entity. According to Chase, Urban was employed by JPMorgan Chase Bank, N.A. and the defendant named here did not employ Urban, terminate his employment, settle with him, file termination forms with the Financial Industry Regulatory Authority, or even have membership in that organization. Nevertheless, neither Chase nor Urban have suggested that any other entity is a necessary party. The affiliation between the various Chase entities is further indicated by the fact that Chase's counsel, Anna Wermuth, is the lawyer who opposed Urban's initial suit in 2011, as well as all of his subsequent claims. Accordingly, we refer to defendant J.P. Morgan Chase & Co. as Urban's former employer.

improve Urban's job performance by putting him on a written "Action Plan" in early May 2009 with daily goals for the remainder of the month. However, in July 2009, Urban was put on another "Action Plan," this one lasting for 30 days. Also, within that same month, he received a third "Written Warning" for "continued performance issues" and for a zero rating by a mystery shopper/undercover investigator who documented that Urban was still not following Chase's retail marketing methods or the branch manager's coaching. In September 2009, when Urban received his third consecutive zero rating by a mystery shopper, he was called to a job performance meeting with his branch manager, district manager, and market manager. In the same month of September, the branch manager overheard Urban assisting a customer whom he had previously helped enroll in online bill pay access, and the manager realized that during the encounter in August, Urban had violated a Chase policy by inputting "none@none.com" as the customer's e-mail account. During the customer's follow-up visit to the North Pulaski branch in September, the manager overheard Urban violate other Chase policies by using a Chase computer to create a Yahoo e-mail account for the customer. The use of a bank computer was prohibited and the creation of an e-mail account was an additional prohibition. Urban admitted this conduct in a sworn written statement and that he had done this not only to assist the customer, but also to earn incentive pay for himself by selling a bank product or service. A few days later, Chase fired Urban. Chase concluded its response to the EEOC by discussing how Urban's conduct was different from that of a Hispanic coworker whom he contended had engaged in similar policy violations but had not been fired. At Urban's request, the EEOC issued a "Notice of Right to Sue (Issued On Request)" in March 2011 and closed its file.

¶ 5    Urban filed his discrimination claim *pro se* in federal court and later retained an attorney.

The attorney communicated that Urban intended to amend his complaint to allege that Chase had defamed him and intentionally inflicted emotional distress when it reported and explained his employment termination to the Financial Industry Regulatory Authority or FINRA. (Chase was required to notify FINRA of Urban's firing because he was a registered representative of a broker-dealer.) FINRA's Form U-5, Uniform Termination Notice, included a narrative section for explaining the basis for the employee's termination and a series of yes-or-no questions about related events, such as whether there had been a regulatory agency disciplinary action, criminal prosecution, or a customer's lawsuit. Under "3. FULL TERMINATION," "Termination Explanation," Chase had written, "REP ENTERED FALSE E-MAIL ADDRESSES WHEN OPENING BANK ACCOUNTS." Chase had ticked the "yes" box in response to question 7B, "Internal Review Disclosure," which asked Chase, "Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct?" Because of its affirmative response to question 7B, Chase also completed the "INTERNAL REVIEW" section, including the question, "Describe briefly the nature of the internal review," to which Chase had answered, "REP ENTERED FALSE E-MAIL ADDRESSES WHEN OPENING BANK ACCOUNTS." (The same answer that Chase had written in section 3 of the form.) Chase had marked "yes" to both parts of question 7F, regarding "Termination Disclosure," which asked,

"Did the individual voluntarily *resign* from your *firm*, or was the individual discharged or permitted to *resign* from your *firm*, after allegations were made that accused the individual of:

1. violating *investment-related* statutes, regulations, rules or industry standards of

- 4 -

conduct?

2. fraud or the wrongful taking of property?"

Because of Chase's affirmative responses to question 7F, Chase also completed the "TERMINATION" section, where there was a question about "Allegations," to which Chase had answered, "REP ENTERED FALSE E-MAIL ADDRESSES WHEN OPENING BANK ACCOUNTS." (The third time Chase made this statement on the form.)

¶ 6    Urban and Chase settled the federal lawsuit. Their agreement encompassed the Form U-5 that Urban considered defamatory and distressing. They agreed that Chase would "amend the language *** under [the] section titled Termination," so that it stated:

"Terminated by Affiliate Bank. Non-securities related. Representative entered a non-existent email address (*e.g.*, none@chase.com) when enrolling a customer in online bill pay. This conduct is the basis for the firm's responses to 7B and 7F. Investigation revealed no finding of embezzlement, identity theft or any wrongful theft of property."

¶ 7    The parties' settlement agreement also provided for Chase to financially compensate Urban with three payments totaling $10,000. The parties stipulated that their negotiations and agreed-upon terms would be confidential. Their contract concluded:

"HAVING ELECTED TO EXECUTE THIS AGREEMENT, TO FULFILL THE PROMISES AND TO RECEIVE THE CONSIDERATION SET FORTH IN SECTION 1 ABOVE, EMPLOYEE FREELY AND KNOWINGLY, AND AFTER DUE CONSIDERATION, ENTERS INTO THIS AGREEMENT INTENDED TO WAIVE, SETTLE, AND RELEASE ALL CLAIMS EMPLOYEE HAS OR MIGHT HAVE AGAINST THE RELEASE PARTIES AS OF THE EXECUTION OF THIS

AGREEMENT."

¶ 8    The parties whom Urban released included, "JPMorgan Chase Bank, National Association; its parent corporation JPMorgan Chase & Co.; JPMorgan Chase & Co.'s affiliates, divisions, subsidiaries, predecessors, insurers, successors or assigns" and their personnel and attorneys, agents, shareholders, and others. The parties also agreed "to submit to the jurisdiction of the state and/or federal courts located within the State of Illinois for the resolution of any dispute which may arise hereunder." The federal court then dismissed Urban's action, with prejudice.

¶ 9    Chase revised the Form U-5, but not to Urban's satisfaction, and in September 2012, he demanded arbitration before FINRA.[2] Urban sought damages and expungement of the U-5. At the outset, FINRA dismissed Urban's claim for damages, reasoning that he had "waived and forever released Respondent from any and all monetary liability relating to his termination under the terms of the Settlement Agreement *** in connection with his race discrimination lawsuit in federal court." FINRA let stand Urban's "request for expungement of the Form U-5," but after an evidentiary hearing, FINRA ruled that the parties' settlement agreement also encompassed the contents of the Form U-5 and barred the expungement that Urban was requesting.

¶ 10    FINRA issued an "Award" in August 2014 that described Urban's allegations as "libel and slander on Form U5 and wrongful termination." The arbitrators stated:

"The Panel finds that Urban's conduct was not fraudulent, and that Urban's conduct

_____

[2] According to FINRA rules, generally, "a dispute must be arbitrated *** if the dispute arises out of the business activities of a member or an associated person and is between or among [members, members and associated persons, or associated persons]." *Required Arbitration*, FINRA Rule 13200, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13200 (last visited Sept. 23, 2022).

did not violate investment-related rules or industry standards of conduct, just internal procedures for setting up online banking accounts. These findings relate to the questions and responses to Paragraphs 7B and 7F of the U5. The Panel therefore finds that the information on the CRD is not accurate and complete, is clearly erroneous and has no meaningful investor protection or regulatory value.

However, because of the Settlement Agreement issue, the Panel is not ordering expungement. It is the Panel's opinion that based on the Settlement Agreement, Urban agreed to and should also be estopped from pursuing expungement[.]

* * *

*** [E]vidence at the hearing clearly showed that Urban did want as part of the settlement additional amendments to the U5, namely changing [Chase's answers to questions] 7B and 7F from Yes to No. The evidence also showed that Chase specifically refused to change or amend the response to 7B and 7F as part of the settlement. In consideration of the settlement payment and Chase's agreement to include the explanatory language in the U5, Urban agreed to the terms of the Settlement Agreement.

Therefore[,] the Panel rules that Claimant's claim for expungement is barred due to the release of claims under the Settlement Agreement and under the equitable principle of estoppel."

¶ 11    Despite ruling that the federal settlement barred Urban's claims, FINRA said, "Claimant did successfully establish that certain aspects of his U5 relating to his termination are erroneous. Therefore[,] in the interest of fairness and accuracy in disclosure, the Panel recommends and encourages Chase to undertake on its own initiative an amendment of Urban's U5 in the following

respects\*\*\*." FINRA proposed that Chase revise the initial "Termination explanation" so that it read, "TERMINATED BY AFFILIATE BANK. NON-SECURITIES RELATED. REPRESENTATIVE ENTERED A NON-EXISTENT EMAIL ADDRESS (E.G. NONE@CHASE.COM) WHEN ENROLLING A CUSTOMER IN ONLINE BILL PAY. INVESTIGATION REVEALED NO FINDING OF EMBESSLEMENT [(*sic*)], IDENTITY THEFT OR ANY WRONGFUL THEFT OF PROPERTY." In other words, FINRA "recommend[ed] and encourage[d]" Chase to delete the sentence in which it stated, "This conduct is the basis for the firm's responses to 7B and 7F," from the middle of its original narrative. The arbitrators also "recommend[ed] and encourage[d]" Chase to change its responses to 7B and 7F from "yes" to "no." FINRA's other two suggestions were that Chase change the narratives under "Internal Review" and "Investigation DRP [(Disclosure Reporting Page)]" to instead read, "REP ENTERED NON-EXISTENT EMAIL ADDRESSES WHEN OPENING BANK ACCOUNTS."

¶ 12   Thus, the panel's "Award" was:

"After considering the pleadings, the testimony, and the evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1) Claimant's claims, each and all, are hereby denied and dismissed with prejudice by virtue of the Settlement Agreement in Claimant's employment discrimination case against Respondent in U.S. District Court;

2) Respondent's Counterclaim citing the Settlement Agreement is resolved by virtue of the Panel's ruling on the merits against Claimant.

3) However, because of Claimant's claim for expungement was found to have merit,

the Arbitrators have provided an explanation of their decision in this award, recognizing the explanation is for the information of the parties and is not precedential in nature."

¶ 13 Chase amended the Form U-5 in November 2014 to be "consistent with [the arbitrators'] recommendation." In this third version of the Form U-5, Chase revised its explanation for Urban's termination by adding prefatory remarks of "FINRA ARBITRATION PANEL RECOMMENDATION" and "SEE TERMINATION EXPLANATION ON NEXT PAGE." Chase deleted the sentence, "This conduct is the basis for the firm's responses to 7B and 7F." Chase also changed its "yes" answers to questions 7B and 7F(2), but not question 7F(1), and in the "Internal Review DRP" section, Chase added the "Comment" "PLEASE ARCHIVE – 7B WAS FILED IN ERROR."

¶ 14 Urban, however, was not satisfied by Chase's second revision/third U-5. He filed a new arbitration demand before FINRA in 2015. FINRA described this third legal action to again be about "Libel or slander on Form U5 and defamation" which was "related to Claimant's employment with Respondent and the termination" and that Chase had allegedly "failed to honor a settlement, which included an agreement to amend Claimant's Form U5, by only partially amending it." Despite FINRA's earlier determination that Urban's federal settlement was the final word on his right to compensation, he asked FINRA to award him more than $3 million in compensatory and punitive damages. FINRA ruled, "After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination" that all of Urban's monetary claims are "denied in their entirety" and "[a]ny and all claims for relief not specifically addressed herein *** are denied." The panel recommended, but did not order, that "the answer of

'yes' to question 7F(1) should be changed to 'no' on Claimant Craig Urban's Form U5, Occurrence Number 1489914, Event Date 10/24/2009." "These recommendations are made with the understanding that Claimant Craig Urban must obtain confirmation of this award from a court of competent jurisdiction before the CRD will execute the expungement directive. The Form U5 is not automatically amended to include the changes indicated above." After Urban obtained judicial confirmation of FINRA's award, FINRA (not Chase) revised the Form U-5 in April 2019. Thus, there was a fourth version of Urban's Form U-5.

¶ 15    In December 2020, eleven years after he was fired, Urban initiated the seven-count action that is at issue in this appeal. He alleged breach of the March 2012 settlement agreement due to the Form U-5 responses in March 2012 and November 2014 (the second and third versions) (count I); defamation in the Form U-5 responses made in December 2009, March 2012, November 2014, and April 2019 (count II), wrongful discharge from employment (count III), tortious interference with prospective economic advantage through defamation and breach of the settlement agreement and FINRA bylaw duties (count IV), emotional distress as a result of "false U5 responses and ruin of [Urban's] business career" (count V), breach of FINRA bylaw duties owed to Urban with respect to the first three Form U-5's (count VI), and a declaratory judgment request, which was not numbered. He sought unspecified damages dating to his wrongful discharge, unspecified compensatory damages, and judicial declarations regarding the settlement agreement, including that portions of it were "null, void and unenforceable because [Urban] agreed to them under duress."

¶ 16    Chase opposed the pleading with a motion to dismiss, which the circuit court granted, finding that all six counts were barred by *res judicata* and the latter five counts were barred by

various statutes of limitation. This dismissal order is the primary ruling that Urban challenges. The circuit court gave Urban leave to amend his unnumbered declaratory judgment allegations as a separate count, count VII. After Urban filed an amended complaint to restate only his declaratory judgment claim (Count VII), Chase filed a motion to dismiss for failure to state a cause of action, and the circuit court granted Chase's motion and stated the order was final. This is another order that Urban wants reviewed.

¶ 17    The first argument in his appellate brief concerns statutes of limitation, however, we are reordering his arguments so we can address them succinctly. Urban argues that Counts I through VI were erroneously dismissed on *res judicata* grounds because two of the three elements of that doctrine cannot be satisfied by a FINRA arbitration. He contends that a FINRA award is not a final judgment on the merits by a court of competent jurisdiction and that there was no commonality between his FINRA claims and his 2020 lawsuit. He concedes the third element of *res judicata*, in that his FINRA claims and his 2020 suit involved the same parties.

¶ 18    *Res judicata* is a legal doctrine based on the principle that once a cause of action has been adjudicated by a court of competent jurisdiction, the dispute between the parties is conclusively settled, unless there is a direct proceeding to review or set aside the adjudication. *Drabik v. Lawn Manor Savings & Loan Ass'n*, 65 Ill. App. 3d 272, 276 (1978). The first action between the parties is deemed conclusive not only as to all matters that were litigated and determined, but to all matters which might have been presented to support or defeat a claim. *Drabik*, 65 Ill. App. 3d at 277; *La Salle National Bank v. County Board of School Trustees*, 61 Ill. 2d 524, 529 (1975) ("The doctrine of *res judicata* extends not only to what actually was decided in the original action but also to matters which could have been decided in that suit."); *Hudson v. City of Chicago*, 228 Ill. 2d 462,

467 (2008) ("*Res judicata* bars not only what was actually decided in the first action but also whatever could have been decided."); *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 73 (*Res judicata* bars "both questions that were actually decided and those that might properly have been litigated"). Every person is afforded his or her day in court (*Pedigo v. Johnson*, 130 Ill. App. 3d 392, 394 (1985)); however, once a person has litigated or had an opportunity to litigate, *res judicata* will protect parties and judicial resources from the burdens of retrying an identical cause of action with the same party. *In re Marriage of Kohl*, 334 Ill. App. 3d 867, 880 (2002); *People ex rel. McAllister v. East*, 409 Ill. 379, 382 (1951) ("It is a principle universally accepted that the same issue cannot be litigated to a final conclusion between the same parties two or more times, where the first judgment is final, unappealed from, and unreversed"). Even a flawed judgment triggers *res judicata*. " '[H]owever erroneous the decision may be, it is binding upon all parties until it is reversed or set aside in the direct proceeding for that purpose. In other words, the court having jurisdiction has jurisdiction to decide erroneously as well as correctly.' " *LaSalle National Bank*, 61 Ill. 2d at 528-29 (quoting *McAllister*, 409 Ill. at 383).

¶ 19     *Res judicata* is parsed into three elements: (1) an identity or sameness of cause of action exists, (2) a final judgment has been rendered by a court of competent jurisdiction and (3) the parties or their privies are identical in both actions. *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). Paragraph (a)(4) of section 2-619 of the Code (735 ILCS 5/2-619(a)(4) (West 2020)) incorporates the doctrine. *Marvel of Illinois, Inc. v. Marvel Contaminant Control Industries, Inc.*, 318 Ill. App. 3d 856, 863 (2001) (citing 735 ILCS 5/2-619(a)(4) (West 2000)). Our review of a circuit court's application of *res judicata* under section 2-619(a)(4) is *de novo*. *Marvel of Illinois*,

318 Ill. App. 3d at 863; 735 ILCS 5/2-619(a)(4) (West 2020). In a *de novo* review, we "perform the same analysis that a trial judge would perform." *Mayle v. Urban Realty Works, LLC*, 2022 IL App (1st) 210470, ¶ 40.

¶ 20 Urban's argument regarding the effect of his two arbitration demands overlooks his earlier federal suit. In our opinion, all three elements of *res judicata* were satisfied by his federal suit against his former employer, the district court's dismissal of the action with prejudice pursuant to the parties' settlement contract, and the two subsequent arbitration matters.

¶ 21 There is no dispute that Urban's federal and state suits involve an identity of parties, nor is there any disagreement that the two arbitration actions and this state suit are between the same plaintiff and defendant.

¶ 22 Turning to the next *res judicata* element, to determine whether this state court action is based on the same claim, demand or cause of action as Urban's federal suit, we use the transactional test, "which provides that the assertion of different kinds or theories of relief constitutes a single cause of action if a single group of operative facts gives rise to the assertion of relief." *Pepper Construction*, 2016 IL App (1st) 142754, ¶ 74 (citing *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 310 (1998); *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 391-92 (2001)). The plaintiffs in *River Park* wanted to develop real estate located within the boundaries of the defendant City of Highland Park, but the municipality did not approve their development plan and rezoning request. *River Park*, 184 Ill. 2d at 292. The plaintiffs filed a federal civil rights action under 42 U.S.C. § 1983 (1994) without including claims for abuse of power and breach of contract that they later tried to pursue in state court. *River Park*, 184 Ill. 2d at 292. The Illinois supreme court held that the circuit court had properly dismissed the later-filed state court claims

on the basis of *res judicata. River Park*, 184 Ill. 2d at 318-19. Applying the transactional test, the supreme court found there was an identity of cause of action and that the state court claims were barred because the plaintiffs had not asserted them in the federal action. *River Park*, 184 Ill. 2d at 317. Similarly here, a single group of operative facts are the basis of Urban's federal and state court actions. Both suits are about Chase's termination of Urban's employment and its answers on the FINRA Form U-5. According to the transactional test, Urban's federal and state suits involve the same claim, demand or cause of action. The transactional test also shows that Urban's arbitration claims and this state suit are based on a single group of operative facts—Urban's firing and the contents of the Form U-5—and thus involve the same claim, demand or cause of action.

¶ 23    The third element of *res judicata* is also met. A final judgment was entered by a court of competent jurisdiction in Urban's federal suit. Cases such as *Keim v. Kalbfleisch*, 577 Ill. App. 3d 621, 624 (1978), indicate that the federal court's dismissal with prejudice due to Urban and Chase's settlement agreement was a final judgment for *res judicata* purposes. *Keim* concerned three siblings and the validity of the will that their father executed shortly before his death. *Keim*, 57 Ill. App. 3d at 622. The siblings reached a settlement which the court approved and a final order dismissing the plaintiff's cause of action with prejudice was entered. *Keim*, 57 Ill. App. 3d at 622. Several months later, the plaintiff filed a new suit, alleging that one of the siblings had failed to fulfill terms of the will that would entitle him to a farm and 20 adjoining acres, and that the property should therefore pass by the residuary clause of the will, to all three siblings. *Keim*, 57 Ill. App. 3d at 623. The appellate court did not interpret any terms of the will and instead held that the final judgment order in the first suit barred a second suit regarding the will's terms since it was a matter that could have been put in issue and decided in the first suit:

"If a court approves a settlement, it merges all included claims and causes of action and is a bar to further proceedings. [Citations.] Furthermore, a dismissal 'with prejudice' is as conclusive of the rights of the parties as if the suit had been prosecuted to a final adjudication adverse to the plaintiff. [Citation.]" *Keim*, 57 Ill. App. 3d at 624.

¶ 24    Thus, *Keim*, 57 Ill. App. 3d 621, indicates that the previous settlement and dismissal with prejudice of the federal suit precludes the parties from relitigating Urban's termination and the Form U-5 in this state court. Some recent cases have noted a split in authority as to whether a dismissal with prejudice pursuant to a settlement agreement amounts to a final judgment on the merits (see *Jackson v. Callan Publishing, Inc.*, 356 Ill. App. 3d 326, 340 (2005) (noting the split and stating "[t]he modern view generally recognizes that a valid consent judgment is entitled to a *res judicata* effect")), but we need not wade into the distinctions here, because all of the claims that Urban included in this state court suit were ones that he had previously submitted and resolved in the FINRA arbitrations. Each of Urban's two FINRA awards was entered only after the arbitrators conducted full hearings. Thus, the arbitrators entered final judgments on the merits and it is established law that arbitration awards are entitled to *res judicata* effect. "A valid [arbitration] award has all the force of an adjudication, and precludes the parties from again litigating the same matters." *Monmouth Public Schools, District No. 38 v. Pullen*, 141 Ill. App. 3d 60, 69 (1985) (citation omitted); Restatement (Second) of Judgments § 84 (1982); *Pepper Construction*, 2016 IL App (1st) 142754, ¶ 73 (stating that generally, arbitration awards have the same *res judicata* effect as a court judgment). In Urban's 2012 arbitration, the panel determined that his claims about his employment termination and the contents of the Form U-5 were encompassed by his federal suit and were barred by that resolution. The arbitration panel affirmatively stated, "Claimant's claims,

each and all, are hereby denied and dismissed with prejudice by virtue of the Settlement Agreement in Claimant's employment discrimination case against Respondent in U.S. District Court." Consequently, the panel could do no more than "recommend[] and encourage[] Chase to undertake on its own initiative an amendment to Urban's [U-5]," rather than order Chase to revise the report. An evidentiary proceeding was also conducted in Urban's 2015 arbitration action and those arbitrators made similar "recommendations" about the U-5. As a matter of law, each of these two FINRA arbitration awards constitutes a final adjudication on the merits for *res judicata* purposes and each precludes Urban from again litigating issues stemming from his employment termination and Chase's answers on the Form U-5. *Monmouth Public Schools*, 141 Ill. App. 3d at 69.

¶ 25    *Res judicata* was properly applied to bar Urban from relitigating the same cause of action that he sued over in his federal suit and the two subsequent FINRA arbitrations. Once a person has litigated or had an opportunity to litigate, *res judicata* will protect parties and judicial resources from the burdens of retrying an identical cause of action with the same party. *In re Marriage of Kohl*, 334 Ill. App. 3d at 880; *People ex rel. McAllister v. East*, 409 Ill. at 382 (the same issue cannot litigated to a final conclusion between the same parties two or more times); *Piagentini v. Ford Motor Co.*, 387 Ill. App. 3d 887, 890 (2009) (*res judicata* prevents a multiplicity of lawsuits between the same parties where the facts and issues are the same); *Arvia v. Madigan*, 209 Ill. 2d 520, 533 ("*Res judicata* promotes judicial economy by preventing repetitive litigation and [additionally] protects parties from being forced to bear the unjust burden of relitigating essentially the same case.").

¶ 26    Urban's arguments to the contrary are not persuasive. He ignores his federal suit entirely. He argues that the FINRA awards were not "judgments" rendered by a court, lack "finality," and

were not "on the merits." These contentions, however, are not supported by the facts or Illinois case law. Urban's argument that the FINRA awards were not valid "judgments" in a *res judicata* analysis relies on Louisiana authority, *Interdiction of Harold Otis Wright*, 75 So. 3d 893 (La. 2011). Relying on this case was a misstep because (1) cases from other jurisdictions are not binding on Illinois courts and (2) this particular Louisiana holding is contrary to the controlling Illinois law that we discussed immediately above. *Wood v. Evergreen Condo. Ass'n*, 2021 IL App (1st) 200687, ¶ 54 (noting that cases from foreign jurisdictions are not binding authority on Illinois courts, and then finding that the particular cases cited by the appellant had no persuasive value because they were contrary to Illinois law and the facts); *Draper & Kramer, Inc. v. King*, 2014 IL App (1st) 132073, ¶ 31 (indicating that decisions of foreign courts are not binding on Illinois courts, but the use of foreign decisions as persuasive authority is appropriate where Illinois authority on point is lacking). He also quotes from the Uniform Enforcement of Judgments Act, which is codified in Illinois at 735 ILCS 5/12-651 (West 2020), for the definition of a court whose judgment "is entitled to full faith and credit" in Illinois. Since no one here is attempting to enforce a foreign judgment, neither the statute nor the definition has any relevance in our *res judicata* analysis. We reiterate that Illinois precedent consistently indicates that for purposes of *res judicata*, arbitration awards have the same preclusive effect as a court's judgment. *Monmouth Public Schools*, 141 Ill. App. 3d at 69.

¶ 27    Urban next argues that the FINRA arbitration awards lack "finality" because the orders "weren't issued with prejudice" and they were expungement arbitrations that are "non-final under [FINRA] rules." Urban supports this contention with citation to Illinois precedent, *Ward v. Decatur Memorial Hospital*, 2019 IL 123937, ¶ 48, but he misapprehends both the facts and the

law. In *Ward*, the Illinois Supreme Court indicated that the dismissal of a complaint with leave to amend was not a final order because it did not "terminate[] the litigation" or "firmly establish the parties' rights," and, thus had no *res judicata* effect. *Ward*, 2019 IL 123937, ¶ 49. *Ward* is neither factually nor legally relevant because Urban's FINRA claims were resolved on their merits, and the awards did terminate the arbitration actions and conclusively determine Urban and Chase's respective rights. In fact, in the 2012 arbitration, "[a]fter considering the pleadings, the testimony, and the evidence presented at the hearing," the arbitrators entered a nine-page, full description of the dispute and the panel's "deci[sion] in full and final resolution of the issues submitted for determination." In the 2015 arbitration, the panel took into consideration "the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions" and then entered its five-page account of what led to the action and the panel's "deci[sion] in full and final resolution of the issues submitted for determination." Those rulings are plainly on the merits and intended to conclude the actions for all time. We are looking at the apparent intended effect of those rulings not for the inclusion of any "magic" words such as "with prejudice" to animate them. *Schal Bovis, Inc. v. Casualty Insurance Co.*, 314 Ill. App. 3d 562, 568 (1999) ("Whether a trial court's dismissal order is final, and thus appealable, or not final, and thus not appealable, is a function of its effect, not of its incantation of any particular magic words, such as 'with prejudice' or 'without prejudice.' "). Furthermore, Urban's contention that the FINRA awards were "non-final under [FINRA] rules" is a misreading of FINRA Rules 13212 and 13511, which are about sanctions, not about final awards. See *Sanctions*, FINRA Rule 13212, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13212 (last visited Sept. 21, 2022); *Discovery Sanctions*, FINRA Rule 13511, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13511 (last visited Sept.

21, 2022). Those rules have no relevance to this appeal. He also cites FINRA Rule 2080, which indicates that expungements must be judicially confirmed, but he does not cite any authority or argue why the failure to pursue confirmation of a FINRA award would render it a "non-final" award. See *Obtaining an Order of Expungement of Customer Dispute Information from the Central Registration Depository (CRD) System*, FINRA Rule 2080, https://www.finra.org/rules-guidance/rulebooks/finra-rules/2080 (last visited Sept. 21, 2022). In any event, Urban obtained judicial confirmation of his second arbitration award. So, even if we assume for the purposes of argument that a FINRA award is not final until it is judicially confirmed, Urban has cured that supposed infirmity. His argument about the finality of the FINRA decisions is not persuasive.

¶ 28    Urban next attacks the *res judicata* effect of the arbitration awards by arguing that the arbitrators deferred to the parties' federal settlement agreement instead of ruling "on the merits" of his arbitration demand. He asks us to compare the FINRA awards with the ones described in *Taylor v. Peoples Gas Light & Coke*, 275 Ill. App. 3d 655 (1975): "Both arbitrators issued comprehensive written orders, finding clear and convincing evidence that the plaintiffs had sold stolen gas meters and that their discharges [from their employment at the utility company] were based upon proper cause." *Taylor*, 275 Ill. App. 3d at 658. The court also said, "The factual issues forming the basis for the plaintiffs' claims were actually and necessarily decided by the arbitrators." *Taylor*, 275 Ill. App 3d at 663. Urban contends that his two awards "had none of these elements." He offers no authority indicating the FINRA awards had to include any particular elements to be given preclusive effect. Furthermore, the awards were comprehensive written orders. The first award was nine pages of single-spaced text, the second award was five pages of single-spaced text, and both awards described the parties' pleadings, detailed the relief

each side was requesting, described other issues that had been considered and decided (*e.g.*, a motion to dismiss), and then thoroughly described and resolved the main issues. Urban has failed to cite any authority suggesting that these comprehensive orders do not merit *res judicata* effect. He next argues that the arbitration awards were not "on the merits" because they did not satisfy Illinois Supreme Court Rule 273. Rule 273 states, "Unless the order of dismissal or a statute of this State otherwise specifies, an involuntary dismissal of an action, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits." Ill. S. Ct. R. 273 (eff. Jan 1, 1967). This rule is applicable to civil proceedings in the trial court and has no implication for proceedings before FINRA.

¶ 29    Urban also contends that FINRA is not a "court" and is not a court of "competent jurisdiction." The distinction that he draws is inconsequential. As discussed above, arbitration awards have the same *res judicata* effect as judicial decisions and prevent the parties from relitigating. *Monmouth Public Schools*, 141 Ill. App. 3d at 69.

¶ 30    Given our conclusions about the *res judicata* doctrine, we find it unnecessary to reach Urban's additional argument regarding Counts I through VI, that the circuit court misconstrued the various statutes of limitation that it applied to his pleading.

¶ 31    In the latter section of his brief, Urban addresses Count VII, stating, but not arguing that the circuit court erred in dismissing this declaratory judgment count under section 2-615 of the Code. 735 ILCS 5/2-615 (West 2000). We note that Illinois is a fact-pleading jurisdiction, meaning that the plaintiff's complaint must include factual allegations that bring the case within the asserted cause of action, and that section 2-615 is the avenue for a defendant to point out the factual inadequacy of a complaint. *Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill.

App. 3d 929, 939 (2004). Urban accurately relates that the circuit court dismissed Count VII because "[Urban] fails to identify any facts supporting the declaration he seeks." According to Urban, supporting facts would "have no bearing on whether the Count VII allegations meet the 2-615 requirement of pleading the elements [of a declaratory judgment claim]." This is all he has to say, however, in support of Count VII and it is hardly an effective position for him to take. Rule 341 mandated that Urban's opening brief include, "Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). The rule specifies, "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). In *Gandy*, for instance, an appellant who cited authority and stated a conclusion, without supporting it with adequate citation to the record, analysis of the authority, or cohesive legal argument was found to have forfeited review. *Gandy v. Kimbrough*, 406 Ill. App. 3d 867, 875-76 (2010) ("We will not sift through the record or complete legal research to find support for this issue."). Urban's bare statement about Count VII, lacking cohesive legal argument and analysis of authority, has also resulted in forfeiture of our review.

¶ 32    Three issues remain. First, Urban states that the circuit court erred by denying his motion to strike the memo Chase filed in support of its motion to dismiss, despite Urban's argument that Chase's three footnotes appeared to violate the circuit court's standing order that parties use a 12-point font and double-spaced lines of text. The circuit court did not explain its reason for denying Urban's motion to strike the memo, but it authorized him to subsequently exceed the usual 15-page response limit by filing 20 pages. Urban then filed a 20-page response brief.

¶ 33    The second remaining issue is that Urban filed a motion seeking a sanction against Chase

for its use of an ellipse in its memo, "According to Urban's own allegations, after the settlement, 'Chase file[d] a new U5. It has the Revised Termination Explanation required by the Settlement Agreement…' " Urban argued that the statement was sanction-worthy because Chase's truncated description of the new or revised Form U-5 was "deceitful[]" and a "deliberate, gross distortion" of his concerns. Urban used his motion to explain the meaning of the allegation that Chase had replaced with the ellipse. The circuit court denied Urban's motion without explanation. He contends this was error.

¶ 34    The third issue is that Urban next filed a motion to strike Chase's reply brief, in which he contended that the use of five footnotes gave Chase an unauthorized extra page of argument. Urban described the footnotes as the "same ruse" that Chase had employed earlier and argued that since Chase was "on written notice of that violation," the situation was "particularly egregious." Urban asked the circuit court to admonish counsel and disregard the reply brief until Chase had shown good cause for its excess argument. The circuit court denied the motion without analysis. Urban contends this was an additional error.

¶ 35    Chase responds that the motions lacked merit and were trifling, Urban has not shown grounds for reversal, and his appellate presentation is actually so lacking that he has waived review.

¶ 36    We agree with Chase's waiver argument and that we need not review the rulings. Urban's opening brief does not include sufficient citation to the record or any citation to supporting authority. We reiterate our discussion of *Gandy*, 406 Ill. App. 3d at 875-76 ("We will not sift through the record or complete legal research to find support for this issue."). Chase contends that Urban has provided "even less than the litigant in *Wolfe*." *Wolfe v. Menard, Inc.*, 364 Ill. App. 3d

338, 348 (2006). The appellant in *Wolfe* forfeited most of its arguments by violating "the rule in various ways, such as failing to include references to the record or improperly referencing the record, leaving us to hunt for the matters cited; drawing conclusions instead of articulating its contentions and reasoning; and failing to cite case authorities." *Wolfe*, 364 Ill. App. 3d at 348 (citing to the rule as it was previously numbered, Ill. S. Ct. R. 341(e)(7) (eff. Oct. 1, 2001). Urban's record citations are to his first motion to strike, but not his motion for sanctions or his second motion to strike. He cited the circuit court orders that he contends are erroneous, but not the circuit court's standing orders that he contends Chase violated. He did not cite any precedent addressing a motion to strike a brief or sanction a party for the contents of its brief, illustrating suitable consequences for violating a standing order, or otherwise involving a discretionary ruling. Although a reply brief is not the place to introduce new argument, Urban's reply includes a citation to the website "www.cookcounty.org," where it seems we are to navigate our own way to the subpage containing standing orders for the division of the circuit court or the particular judge who presided over this matter. He did not try to remedy the other briefing deficiencies that Chase remarked upon, such as "he does not even assert he was prejudiced [by the circuit court's denials] (which he was not)."

¶ 37 We will not sift through the record or undertake research that Urban should have completed into the law governing motions to strike or sanction. Urban forfeited our consideration of those rulings. *Gandy*, 406 Ill. App. 3d at 875-76; *Wolfe*, 364 Ill. App. 3d 348; *Thrall Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986) (an appellant may not foist the burdens of research and argument onto a court of review).

¶ 38 Based on the reasons set out above, we affirm the orders of the circuit court.

1-21-1389

¶ 39    Affirmed.